# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-2217
_____

United States of America

*Plaintiff - Appellee*

v.

Rodney Eugene Hughes

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines

_____

Submitted: April 17, 2015
Filed: July 29, 2015

_____

Before BYE and SMITH, Circuit Judges, and SCHILTZ,[1] District Judge.

_____

SCHILTZ, District Judge.

Rodney Hughes was convicted by a jury of eleven felony counts of violating the Lacey Act, 16 U.S.C. §§ 3371-3378. The Lacey Act makes it a crime to sell in interstate commerce any wildlife taken in violation of state law, 16 U.S.C.

_____

[1]The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota, sitting by designation.

§ 3372(a)(2)(A), and further makes it a crime to make or submit any false record with respect to any wildlife that is transported in interstate commerce, 16 U.S.C. § 3372(d)(2). A violation of the Lacey Act can be either a misdemeanor or a felony, depending on whether the market value of the wildlife in question exceeds $350.

Hughes appeals his convictions, arguing that the district court erroneously instructed the jury concerning the market value of the wildlife involved in his offenses. We agree with Hughes that the jury instructions were erroneous and that the error was not harmless. Accordingly, we reverse and remand for a new trial.

## I. BACKGROUND

During the time relevant to this case, Hughes owned and operated Midwest USA Outfitters ("Midwest"), which provided guides and other services to hunting parties in Iowa and Missouri. The hunting packages cost between $1,600 and $2,600 per person and included accommodations, meals, hunting stands, field dressing, and carcass-cleaning facilities.

On separate occasions in late 2008, out-of-state hunters hired Midwest to conduct guided deer hunts in Iowa. To hunt buck in Iowa, a hunter must have a buck license or "tag." Iowa residents are automatically entitled to a buck tag (so long as they apply and pay for it), but non-residents must enter a lottery. To ensure that his non-resident clients could hunt buck, Hughes gave them buck tags that belonged to other individuals. After these non-resident clients killed a buck, Hughes (or, at Hughes's instruction, the client) falsely reported to the Iowa Department of Natural Resources that the owner of the tag had killed the buck. The bucks were later transported out of state.

Hughes was indicted for 16 counts of violating the Lacey Act.[2] To establish the market value of the deer, the government offered two kinds of evidence: (1) evidence of the price that Hughes charged for the hunting expeditions and (2) evidence concerning the statutory amounts by which, under Iowa law, a person convicted of unlawfully taking an animal must "reimburse the state . . . ." *See* Iowa Code § 481A.130. For his part, Hughes offered evidence that the antlers taken from the deer were worth no more than $125 on the open market, and in some cases were worth only a few dollars.

With respect to the market value of the wildlife, the district court instructed the jury as follows:

> In determining the market value of the wildlife, you may, but are not required to, consider:
>
> 1) the price the wildlife would bring if sold on the open market between a willing buyer and seller;
>
> 2) the price a hunter would pay for the opportunity to participate in a hunt for the wildlife; or
>
> 3) the State of Iowa's valuation of the wildlife in state prosecutions where such wildlife is unlawfully taken;
>
> if you find such evidence reasonably establishes a market value for the wildlife.

App. 132.

---

[2]The indictment included two counts relating to a May 2008 turkey hunt. As recounted below, the district court later granted Hughes's motion for acquittal on those counts.

For each count on which the jury convicted Hughes, the jury was given a special interrogatory to determine the basis on which the jury calculated the market value of the wildlife. The jury was given the option of checking any or all of the following: the price the wildlife would bring if sold on the open market by a willing seller to a willing buyer; the price a hunter would pay for the opportunity to participate in a hunt for the wildlife; and the State of Iowa's valuation of the wildlife in state prosecutions where such wildlife is unlawfully taken.

At the close of the evidence, the district court granted Hughes's motion for acquittal on Counts 9 and 10. The jury convicted Hughes of all remaining counts with the exception of Count 12. The district court granted Hughes's post-trial motion for judgment of acquittal on Counts 1 and 2, leaving Hughes convicted of six counts of illegally selling wildlife taken in violation of state law and five counts of making or submitting a false record of wildlife transported in interstate commerce. With respect to each of the counts of conviction, the jury found that the market value of the wildlife exceeded $350 based on both (1) the price a hunter would pay for the opportunity to participate in a hunt for the wildlife and (2) Iowa's valuation of the wildlife in state prosecutions where such deer is unlawfully taken. The jury did not base its finding on the price that the wildlife would fetch on the open market.

The district court sentenced Hughes to three years' probation, $7,000 in fines, and $1,802.50 in restitution. This appeal followed.

## II. ANALYSIS

"We typically review district courts' rulings concerning contested jury instructions for an abuse of discretion, and we reverse only when any error was prejudicial. However, when our review requires statutory interpretation, it is an issue of law that we consider de novo." *United States v. Petrovic*, 701 F.3d 849, 858 (8th Cir. 2012) (internal quotations, brackets, and citations omitted). "If we conclude that

the district court's interpretation of the statute resulted in the omission of a required element of the offense, we then apply harmless error review." *United States v. Carlson*, 787 F.3d 939, 944-45 (8th Cir. 2015) (citation and quotations omitted).

## A.

Hughes was convicted of violating 16 U.S.C. § 3372(a)(2), which makes it a crime to sell in interstate commerce any wildlife that was taken in violation of state law. He was also convicted of violating 16 U.S.C. § 3372(d)(2), which makes it a crime to make or submit a false record, account, label, or identification of wildlife that has been or is intended to be transported in interstate commerce. For both crimes, the distinction between a misdemeanor and a felony rests in part on the market value of the wildlife. Specifically, 16 U.S.C. § 3373(d)(1)(B) provides for felony-level penalties for an offender who "knowingly engag[es] in conduct that involves the sale or purchase of . . . fish or wildlife or plants with a market value in excess of $350 . . . ." Similarly, 16 U.S.C. § 3373(d)(3)(A)(ii) provides for felony-level penalties for mislabeling offenses that involve "the sale or purchase, offer of sale or purchase, or commission of an act with intent to sell or purchase fish or wildlife or plants with a market value greater than $350 . . . ."

The Lacey Act does not define "market value." "When terms used in a statute are undefined, we give them their ordinary meaning." *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995). The ordinary meaning of "market value" is the value set by the market — that is, "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction . . . ." *Black's Law Dictionary* 1785 (10th ed. 2014); *see also Olson v. United States*, 292 U.S. 246, 257 (1934) (defining market value to be "the amount that in all probability would have been arrived at by fair negotiations between an owner willing to sell and a purchaser desiring to buy," taking into account "all considerations that fairly might be brought forward and reasonably be given substantial weight in such bargaining");

*Urban Hotel Dev. Co. v. President Dev. Grp., L.C.*, 535 F.3d 874, 879 (8th Cir. 2008) ("Generally, the fair market value is 'the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy nor to sell and both being informed of all the relevant circumstances.'") (quoting *Campbell v. Comm'r*, 943 F.2d 815, 823 (8th Cir. 1991)); *cf. United States v. Butler*, 694 F.3d 1177, 1181 (10th Cir. 2012) ("In ordinary usage, the phrase 'fair-market retail price' is most naturally read as the price a willing buyer would pay to a willing seller for the deer in question.").

B.

The government does not appear to disagree with this definition of "market value." Instead, the government argues that, to establish that the market value of the *wildlife* exceeded $350, all it must do is establish that the price of the *guide services* exceeded $350. As the government would have it, the sale of guide services is a sale that is prohibited under the Act, and a sale of such services for a price in excess of $350 constitutes a felony under the Act.

To support its argument, the government cites 16 U.S.C. § 3372(c), which provides, in relevant part:

> (1) Sale
>
> It is deemed to be a sale of fish or wildlife in violation of this chapter for a person for money or other consideration to offer or provide —
>
>> (A) guiding, outfitting, or other services; or
>> (B) a hunting or fishing license or permit;

-6-

for the illegal taking, acquiring, receiving, transporting, or possessing of fish or wildlife.

Congress enacted § 3372(c) in response to *United States v. Stenberg*, 803 F.2d 422 (9th Cir. 1986), in which the Ninth Circuit held that the furnishing of guide services does not constitute the sale of wildlife within the meaning of the Lacey Act. *See United States v. Atkinson*, 966 F.2d 1270, 1273 n.4 (9th Cir. 1992) ("The express purpose of this amendment was to overturn our holding in *Stenberg*.").

By virtue of § 3372(c), then, the offer or provision of guide services satisfies the "sale" element of offenses punishable (as either misdemeanors or felonies) under the Lacey Act. In other words, someone who sells the services of a guide to hunt wildlife is deemed to be selling the wildlife itself. This is logical; it is reasonable to consider a portion of the sale price for guide services to be allocated to the wildlife that is the ultimate object of the hunt. Indeed, the Fifth Circuit interpreted the Lacey Act in this manner even before Congress amended it. *See United States v. Todd*, 735 F.2d 146, 152 (5th Cir. 1984) ("A commercial arrangement whereby a professional guide offers his services to obtain wildlife illegally is an offer to sell wildlife.").

This does not mean, however, that the price of the guide services should be deemed to conclusively establish the market value of the wildlife. Put another way, it does not make sense to allocate, as a matter of law, one hundred percent of the cost of the guide services to the wildlife. This case illustrates the point: When a hunter paid $1,600 to $2,600 to Hughes, the hunter received not just the deer that he or she killed, but accommodations, meals, hunting stands, field dressing, carcass-cleaning facilities — and, of course, the services of a professional guide. Clearly, then, the price of *guide services* is not the same thing as the market value of *wildlife*.

The market value of, say, a whitetail deer with a Boone and Crockett Club score of 160 is the price that a willing buyer would pay to a willing seller for that deer on

the open market. That is true whether the deer was killed by a hunter without the help of a guide, or by a hunter who paid a guide $200 to meet him in a nearby field, or by a hunter who paid a guide $5000 to provide air transportation to the site of the hunt, luxury accommodations, gourmet meals, taxidermy services, and other amenities. Equating the market value of the deer to the price of any guide services would mean that two defendants who sold deer with identical market values would be treated differently — one convicted of a felony, the other of a misdemeanor — based not on the market value of the wildlife, but based on the price of such things as meals and accommodations.

Such a result is at odds with the plain language of the statute. The language of the Lacey Act is clear: a violation is a felony only if the market value of the "fish or wildlife or plants" exceeds $350. The sale element on which the government relies is entirely separate from the market-value element that distinguishes felonies from misdemeanors. The fact that the sale element is satisfied because guide services were sold does not mean that the market-value element is satisfied.

"Especially in the interpretation of a criminal statute subject to the rule of lenity, we cannot give the text a meaning that is different from its ordinary, accepted meaning, and that disfavors the defendant." *Burrage v. United States*, 134 S. Ct. 881, 891 (2014) (internal citation omitted). For that reason, we cannot agree with the government that selling guide services for more than $350 automatically constitutes a felony under the Lacey Act.

Although our holding finds some support in the reasoning of the Tenth Circuit's *Butler* decision, *see* 694 F.3d at 1180-83, we recognize that cases from the Fifth Circuit and the Ninth Circuit can be read to support the government's position, *see United States v. Todd*, 735 F.2d 146 (5th Cir. 1984); *United States v. Atkinson*, 966 F.2d 1270 (9th Cir. 1992). To the extent that these cases hold that a price of guide services in excess of $350 conclusively establishes a felony violation, we respectfully

-8-

disagree. Our disagreement with these cases may be more apparent than real, however. As discussed below, we believe that, in determining the market value of wildlife, the jury may consider evidence of the price of guide services. We agree with the Fifth and Ninth Circuits that evidence of the price of guide services is *relevant* to the market value of the wildlife; we simply do not agree that it is always the *same* as the market value of the wildlife (or, for that matter, that it is always the "*best* indication of the value of the game," *Todd*, 735 F.2d at 152 (emphasis added)).

## C.

The instructions given to the jurors who convicted Hughes should have told them that the market value of the wildlife was the price that the wildlife would bring on the open market if sold by a willing seller to a willing buyer. Instead, the district court instructed the jury that, "[i]n determining the market value of the wildlife, you may, but are not required to, consider . . . the price the wildlife would bring if sold on the open market between a willing buyer and seller . . . ." In other words, the jurors were instructed that, in determining *the market value of the wildlife*, the jury was "not required to consider" *the market value of the wildlife*. This was error.

The instructions were flawed in another respect. The instructions told the jurors that, in determining the market value of the wildlife, they could consider three things: (1) the market value of the wildlife; (2) the price that a hunter would pay for the opportunity to participate in a hunt for the wildlife; and (3) Iowa's valuation of the wildlife under Iowa Code § 481A.130. All three of these options were presented as equally valid measures of market value. The instructions did not explain to the jury that its ultimate task was to determine market value as that term is commonly understood — namely, as the price that a willing buyer would pay to a willing seller in an arm's-length transaction. Instead, the instructions permitted the jury to convict Hughes of a felony even if the jury found that the market value of the wildlife did *not* exceed $350, as long as the jury found that the price of the hunt or the amount

specified under Iowa Code § 481A.130 exceeded $350. While these latter amounts may be *relevant* to determining market value, they are not *themselves* market value. The district court erred in failing to provide a definition of market value and in permitting the jury to treat the price of the guide services and the valuation of the wildlife under Iowa law as substitutes for market value.

To be clear, we do not agree with Hughes that the jury should not have been allowed even to consider the price of the guide services or the valuation of the wildlife under Iowa law. Whether the market value of the wildlife exceeded $350 is a question of fact. *United States v. Atkinson*, 966 F.2d 1270, 1273 (9th Cir. 1992); *cf. United States v. Oehlenschlager*, 76 F.3d 227, 229 (8th Cir. 1996) (the "market value" of wildlife under § 2Q2.1 of the Guidelines is a question of fact). The Federal Rules of Evidence set an extremely low threshold in defining what evidence is relevant to a question of fact: "Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence . . . ." Fed. R. Evid. 401(a). We believe that, at least in mine-run cases, the price of guide services to harvest a particular type of wildlife will be relevant to the market value of that wildlife. Common sense and experience tell us that, the more valuable the wildlife, the higher the price a buyer would likely be willing to pay for the guide services necessary to obtain it. While it was error to permit the jury to treat the price of the hunt as the *same* as the market value of the wildlife, it would not be error to permit a properly instructed jury to consider evidence of the price of the hunt in determining the market value of the wildlife.

Whether the jury should have been allowed to consider the valuation of the wildlife under Iowa law is a closer question. The government does not seem to seriously dispute that the (static) amounts set by Iowa Code § 481A.130 have, at best, only an attenuated connection to (fluid) market values. But, at least on this record, we are not prepared to hold that statutory valuations have *no* connection to market values,

-10-

and thus we think it is within the province of the jury to determine how much weight, if any, to give statutory valuations such as those found in Iowa Code § 481A.130.[3]

In this case, though, the jury was not properly instructed as to the meaning of "market value," and we cannot say that the error was harmless. *Cf. United States v. Cacioppo*, 460 F.3d 1012, 1025 (8th Cir. 2006) ("Any misinstruction may be harmless if the evidence of guilt is overwhelming."). Hughes presented (largely uncontested) evidence that the market value of the antlers taken from each of the deer was far less than $350, and he also presented evidence that the amounts set forth in Iowa Code § 481A.130 do not reflect market value. A jury that was properly instructed as to the meaning of "market value" may very well have acquitted Hughes of the felony charges based on this evidence. But because the jury was entitled to consider the government's evidence regarding the price of the guide services and the valuation of the wildlife under Iowa law, it is also possible that a properly instructed jury might have found that the market value of the wildlife exceeded $350. For that reason, we cannot remand for entry of judgment on the lesser-included misdemeanors, as Hughes requests. Instead, we vacate and remand for retrial.

\* \* \*

We vacate Hughes's felony convictions and sentences and remand to the district court for a new trial.

---

[3]This would especially be true in cases in which direct evidence of the market value of a particular type of wildlife is lacking because there is no market for that wildlife (perhaps because it is unlawful to buy or sell that wildlife).

BYE, Circuit Judge, dissenting.

I do not believe the district court erroneously instructed the jury when it allowed them to consider the price a hunter would pay for the opportunity to participate in a wildlife hunt when determining whether Hughes's Lacey Act violations were felonies (in excess of $350). As a result, I would affirm Hughes's convictions and sentence. I therefore respectfully dissent from the decision to vacate the convictions and reverse and remand for a new trial.

The Court's primary rationale for reversing the district court is the proposition that the "sale element" of the Lacey Act "is entirely separate from the market-value element that distinguishes felonies from misdemeanors." Ante at 8. I respectfully disagree. The Lacey Act unambiguously states that a person engages in the "sale of fish or wildlife" whenever, for money or other consideration, the person "offer[s] or provide[s] . . . guiding, outfitting, or other services" for the purpose of the illegal taking of wildlife. 16 U.S.C. § 3372(c)(1). That is, the act of guiding or outfitting an illegal hunt is synonymous with the "sale of fish or wildlife." By defining a "sale of fish or wildlife" in this broad manner, Congress necessarily intended the price of the guiding or outfitting services to be considered when determining whether the sale of the fish or wildlife had a market value in excess of $350. Consequently, I do not believe there is a distinction between the so-called "market value" and "sale" elements of the statute.

The propriety of the district court's instruction, which allowed the jury to consider the market value of the hunt, is shown by substituting § 3372(c)(1)'s expanded definition of a "sale of fish or wildlife" into the Lacey Act's relevant criminal penalty provision under § 3373(d)(1)(B). As the Court notes, § 3373(d)(1)(B) in relevant part provides for felony-level penalties when an offender "knowingly engag[es] in conduct that involves the sale . . . of . . . fish or wildlife . . . with a market value in excess of $350." Because § 3372(c)(1) specifically deems the

-12-

act of providing or offering guiding, outfitting, or other services to be a "sale of fish or wildlife," § 3373(d)(1)(B) must be read as triggering felony-level penalties whenever an offender "knowingly engag[es] in conduct that involves the [offering or provision of guiding, outfitting, or other services] with a market value in excess of $350."

The illustration used by the Court to suggest the price of guide services is not the same thing as the market value of wildlife, see ante at 8, is inconsistent with the statute. As the Court notes, the amendment found at § 3372(c)(1) was in direct response to a Ninth Circuit decision which held the offering of guiding or outfitting services did not constitute a sale of wildlife under the Lacey Act. See United States v. Stenberg, 803 F.2d 422, 437 (9th Cir. 1986). By making the offering of guide services synonymous with the sale of wildlife, Congress specifically intended the market value of the guide services to be synonymous with the market value of the wildlife.

The difference between my interpretation of the statute and the Court's becomes transparent by considering this example. Suppose the hunters to whom Hughes had offered or provided guiding, outfitting, or other services had been unsuccessful in bagging a deer. In that case there would be no market value of a particular deer for the jury to consider, only the price of the unlawful hunt. Hughes would nevertheless still be guilty of violating the Lacey Act because "[i]t is deemed to be a sale of fish or wildlife in violation of this chapter for a person for money or other consideration to offer or provide . . . guiding, outfitting, or other services." 16 U.S.C. § 3372(c)(1). And Hughes would be guilty of a felony level violation of the Lacey Act so long as that specific type of prohibited sale of fish or wildlife had "a market value in excess of $350." 16 U.S.C. § 3373(d)(1)(B).

For the foregoing reasons, I respectfully dissent.

_____

-13-